**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

**RICKEY DALE CONLEY ET AL** | **CASE NO. 2:80-CV-01709**

**VERSUS** | **JUDGE JAMES D. CAIN, JR.**

**SCHOOL BOARD OF CALCASIEU PARISH ET AL**

# MEMORANDUM ORDER

Over sixty years ago, parents and guardians of African-American students brought suit in this court against defendant Calcasieu Parish School Board ("CPSB") to challenge the compulsory biracial school system maintained through the policies, practices, customs, and usages of the school district. The court approved a desegregation plan, modified in certain respects by the Fifth Circuit, before the beginning of the 1970–71 school year. Since that time, the school district has made intensive efforts to eliminate the vestiges of *de jure* segregation.

Mindful that federal judicial supervision of local school systems is intended as a "temporary measure," *Freeman v. Pitts*, 503 U.S. 467, 489 (1992), the undersigned began a months-long assessment of CPSB's progress toward achieving unitary status. Doc. 109. After site visits, consultation with court-appointed experts, and an exhaustive review of available data, the court now confirms that the original *Conley* plaintiffs are victorious. They engaged in a noble cause and their heirs, along with countless other students in this district, are the beneficiaries. Based on the best available information and in the absence of

any opposition, the court determines that the school district is entitled to relief from judgment from the consent decree with respect to student assignment, faculty and staff composition, transportation, and extracurriculars. The need for all court-imposed measures tied to these areas, including majority-minority transfers, has reached its end. Accordingly, the court relinquishes supervision over these areas. For the reasons stated below, however, the court maintains its oversight to address CPSB's desegregation obligations with respect to facilities, and more specifically, the funding of academic facilities.

## I.
## BACKGROUND

This desegregation action began with a class action filed on February 3, 1964, on behalf of African-American students in Calcasieu Parish.[1] *See Conley v. Lake Charles Sch. Bd.* ("Conley I"), No. 2:64-cv-9981 (W.D. La. Jun. 12, 1970), at doc. 2, att. 1. In June 1970, the district court approved a desegregation plan requiring *inter alia* redrawing of school zones in Ward 3, reassignment of faculty and staff, and the implementation of a majority to minority transfer policy. *Id.* at doc. 5, att. 6. This plan was modified by the Fifth Circuit with respect to certain student assignment provisions. *Conley v. Lake Charles Sch. Bd.*, 434 F.2d 35 (1970). The Fifth Circuit also stated:

> The Board is free to devise a different plan, or to seek changes and adjustments, and the District Court has discretion to approve such alternatives, provided that no such different plan or adjustment diminishes the extent of desegregation projected by this opinion, and provided further, that the plan ordered by this court, unless modified

[1] Both Calcasieu Parish School Board and Lake Charles School Board, along with their respective superintendents, were originally named as defendants. The two boards were later consolidated under the name Calcasieu Parish School Board. *See Conley v. Lake Charles Sch. Bd.*, 434 F.2d 35, 35 n. 1 (5th Cir. 1970). The Calcasieu Parish school system encompasses six wards and the sole large city, Lake Charles, is located entirely within Ward 3. *Id.* at 35.

> by the District Court within the above limitations, must be put into effect when the schools open for the 1970–71 term.

*Id.* at 40.

Plaintiffs filed a Motion for Additional Relief in November 1980, which was opened as a new suit. *See Conley v. Lake Charles School Board* ("Conley II"), No. 2:80-cv-1709, at doc. 2, att. 1. There they alleged that "vestiges of the dual public school system" remained in Calcasieu Parish, in violation of *Brown v. Board of Education et seq.* After nineteen months of negotiation, plaintiffs and the school board submitted a proposed consent decree order and desegregation plan, which included the merger of W.O. Boston High School with Lake Charles High School. *See id.* at doc. 5, att. 2. In response the district court neither approved nor disapproved of the plan. *Id.* at doc. 2, att. 29. The district court instead quoted the Fifth Circuit's language in *Conley I*, supra, and stated, "It is clear that the School Board is free to make any changes and adjustments, provided that no such change . . . diminishes the extent of desegregation." He further held:

> "'Judicial interpretation in the operation of a public school system raises problems requiring care and constraint. . . . By and large, public education in our nation is committed to the control of state and local authorities.'" *Board of Curators, Univ. of Missouri v. Horowitz*, 435 U.S. 78, 91, quoting *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270 (1968). The court refrains from imposing on Calcasieu Parish School Board any restraints that could circumscribe or handicap the continued experimentation so vital to finding an even partial solution to educational problems. Judicial interference with the administration and management of schools cannot be justified except in the case of a clear and unmistakable disregard of the Constitution.

*Id.* Since the 1980s, when an individual sued on behalf of a putative class to oppose a school merger, no new plaintiffs have attempted to join the suit. *See id.* at doc. 5, att. 2.

On February 2, 2026, the court set a status conference to discuss next steps in order to move the matter toward unitary status. Doc. 109. The status conference, scheduled for February 11, 2026, was discussed at a school board meeting the preceding evening. *See* Minutes of February 10, 2026, Calcasieu Parish School Board Meeting, *available at* https://www.cpsb.org/our-district/minutes. At that meeting numerous community members addressed the board. *Id.* at 8. At the status conference, the court appointed Dr. Daryl Burckel, former president of McNeese State University, as an expert pursuant to Federal Rule of Evidence 706(a). Doc. 115. The following month, the court appointed demographer Michael C. Hefner under Rule 706(a). Doc. 116. The court also made site visits to middle schools and high schools within Ward 3 of Calcasieu Parish to aid in its review.

Both court-appointed experts have now provided their reports. Exhs. A, B. Dr. Burckel demonstrates CPSB's longstanding compliance with the consent decree as well as the funding imbalance created by its zone-specific bonding. Exh. A. Meanwhile, Mr. Hefner shows that the existence of predominantly black schools within Ward 3 is a function of "normal, independent, intervening demographic changes and events" over the past six decades rather than a vestige of prior *de jure* segregation. Exh. B. Accordingly, the court now considers what relief is warranted.

## II.
## LAW & APPLICATION

The ultimate goal of a desegregation case is "transition to a unitary, nonracial system of public education." *Borel on behalf of A.L. v. Sch. Bd. of St. Martin Parish*, 44 F.4th 307, 313 (5th Cir. 2022) (quoting *Green v. School Board of New Kent County*, 391

U.S. 430 (1968)). A district achieves unitary status when it demonstrates that it has complied in good faith with desegregation orders for at least three years and "eliminated the vestiges of prior *de jure* segregation to the extent practicable." *Borel*, 44 F.4th at 314 (quoting *Anderson v. Sch. Bd. of Madison Cnty.*, 517 F.3d 292, 297 (5th Cir. 2008)). To guide courts in the latter determination, the Supreme Court has identified several aspects of school operations that must be considered (commonly referred to as the *Green* factors): student assignment, faculty and staff composition, facilities, transportation, and extracurricular activities. *Borel*, 44 F.4th at 313–14 (citing *Green*, 391 U.S. at 435).

As another court of this district recently recognized, *Green* necessitates a fact-intensive inquiry and can turn unitary status into a "moving target." *Smith v. Sch. Bd. of Concordia Par.*, 2025 WL 3231631, at *2 (W.D. La. Nov. 19, 2025), *vacated*, __ F. 4th __, 2026 WL 2024655 (5th Cir. 2026). "The facts leading to the resolution of [these issues] can best be ascertained through the thorough investigation and complete airing of views which are the hallmarks of the adversarial process." *United States v. Georgia*, 702 F.Supp. 1577, 1580 (M.D. Ga. 1989). In this matter, however, no existing plaintiff is participating in the suit and no new plaintiff has attempted to intervene in the six months since the court noticed its intention to evaluate whether the school district should remain under the consent decree. Accordingly, the court must determine the best route to conclusion in the absence of any timely intervention or opposition to the viewpoints provided by the appointed experts.

The Fifth Circuit has long recognized a district court's ability to grant relief from a judgment or order *sua sponte*. *See, e.g.*, *McDowell v. Celebrezze*, 310 F.2d 43, 44 (5th Cir.

1962) (holding that "the district judge can initiate relief from judgment or order on his own motion."). The court may take this action under Federal Rule of Civil Procedure 60(b), as long as it provides the parties with notice and an opportunity to be heard. *Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189–90 (5th Cir. 2008). Here the court signaled its intention to modify or vacate the consent decree six months ago, through an order setting a status conference and with subsequent orders appointing experts. In that time, despite public attention to the case in the press and before the school board, no one has appeared on behalf of the original plaintiffs. Additionally, no current parent or guardian has sought to intervene as a plaintiff. And the school board has voiced no opposition to the court's intention to examine whether relief should be granted from the consent decree, or to its appointment of experts. Accordingly, the court considers the notice and hearing requirements of Rule 60(b) satisfied.

Rule 60(b) allows the court to relieve a party from a final order or judgment based on:

> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud ... misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason justifying relief.

Fed. R. Civ. P. 60(b). "[A]lthough 'final judgments should not lightly be disturbed,' the 'rule should be liberally construed in order to achieve substantial justice.'" *Steverson v. GlobalSantaFe Corp.*, 508 F.3d 300, 305 (5th Cir. 2007) (quoting *Seven Elves, Inc. v.*

*Eskenazi*, 635 F.2d 396, 402 (5th Cir. 1981)). Consent decrees are subject to Rule 60(b). *League of United Latin Am. Citizens v. City of Boerne*, 659 F.3d 421, 437 (5th Cir. 2011). The vast majority of motions to modify or terminate such institutional reform orders arise under the third clause of Rule 60(b)(5). *Frew v. Janek*, 780 F.3d 320, 326 (5th Cir. 2015). In this matter, however, the first ("satisfied, released, or discharged") is more fitting. To this end, the court must use state contract law to interpret the decree's terms. *Chisom v. Louisiana ex rel. Landry*, 116 F.4th 309, 319 (5th Cir. 2024). Under Louisiana law, courts determine the common intent of the parties by looking to the contract's terms. *Id.* (citing La. Civ. Code arts. 2045, 2046). Further, a contract must "be construed as a whole and each provision in the contract must be interpreted in the light of the other provisions." *Id.* (quoting *Baldwin v. Bd. of Supervisors for Univ. of La. Sys.*, 156 So.3d 33, 38 (La. 2014)).

The district court determined that the plan approved in June 1970, as modified by the Fifth Circuit shortly thereafter, converted Calcasieu Parish School Board to a unitary system within the meaning of *Green v. County School Board of New Kent County*, supra, 391 U.S. 430, and other binding precedent. *Conley I*, No. 2:64-cv-9981, at doc. 5, att. 6, p. 2. But consent decrees "are not intended to operate in perpetuity." *Bd. of Educ. of Okla. City. Pub. Sch., Indep. Sch. Dist. No. 89*, 498 U.S. 237, 248 (1991). Instead, they should "be kept in place only as long as necessary to cure an unlawful condition." *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1192 (10th Cir. 2018).

In the absence of opposition, however, and noting the lack of any activity in this case for over thirty years, the court can conclude that the school board has complied in good faith with all mandates. As Dr. Burckel observed, despite the relatively small

participation in majority-minority transfers, schools in Ward 3 have become more rather than less diverse since 1970. Today only 37 percent of African-American students in Ward 3 attend a school that is predominantly black under the Fifth Circuit's criteria. Exh. A, p. 10. Based on the Hefner report, the court also determines that the existence of predominantly black schools in Ward 3 can no longer be attributed to past *de jure* segregation. Exh. B, pp. 42–43 This is not a problem unique to Calcasieu Parish—generations after *Brown*, schools in the United States lack diversity due to residential demographics, with school integration efforts having little impact. *Hampton v. Jefferson Cnty. Bd. of Educ.*, 102 F.Supp.2d 358, 374 (W.D. Ky. 2000) (citing Steven G. Rivkin, *Residential Segregation & School Integration,* 67 Sociology of Educ. 279, 279 (1994)). The school board's obligation only extends to eliminating, to the extent practicable, the vestiges of former *de jure* school segregation. *Dowell v. Bd. of Educ. of Okla. City Public Schools*, 778 F.Supp. 1144, 1167–68 (W.D. Okla. 1991). It does not have the power to diversify every neighborhood in Calcasieu Parish. Accordingly, majority-minority transfers and attendance zone oversight will no longer be required by the court beginning in the 2027–2028 school year. This ruling does not prevent the school board from phasing out majority-minority transfers in the manner it sees fit, as the court has no interest in disrupting the life of a student who is already established at an out-of-zone school through this program. Additionally, the school board retains full authority to grant out of zone permits for educational and family needs.

As demonstrated by Dr. Burckel's report and through the court's site visits, the school board has also complied in good faith and eliminated the vestiges of *de jure* to the

extent practicable with respect to faculty and staff composition, transportation, and extracurriculars. Accordingly, it is also relieved of all court mandates and oversight tied to these areas.

## III.
## FACILITY FUNDING

With respect to facilities, however, the Burckel report highlights a troubling imbalance. The school district relies on eleven separate taxing jurisdictions, known as school bonding districts, to fund school construction and facility improvements. Exh. A, p. 13 & T. 12. High valuation districts, such as those containing valuable industrial property, generate more revenue per mill. Meanwhile, lower valuation districts struggle to fund even basic facility upgrades. For example, the 2026 taxable valuations for School Bonding District 23 (Westlake) are estimated at $1,129,314,022.00, covering 2,495 pupils. *Id.* at Table 12. Meanwhile, School Bonding District 33 (Southeast Lake Charles) has a student population of 3,964 and 2026 taxable valuations estimated at only $271,096,702.00. This results in an enormous disparity in per-pupil funding capacity. As shown by the example of School Bonding District 27 (Moss Bluff), the problem is not limited to the Lake Charles city limits:

**District 23 (Westlake)**

- **Revenue per 1 mill: $1,106,728.00**
- **Student population: 2,495**
- **Funding capacity: $443.58 per student per mill**

**District 33 (Southeast Lake Charles)**

- **Revenue per 1 mill: $265,675.00**
- **Student population: 3,964**
- **Funding capacity: $67.02 per student per mill**

**District 27 (Moss Bluff)**

- **Revenue per 1 mill: $134,859.00**
- **Student population: 3,449**
- **Funding capacity: $39.10 per student per mill**

Accordingly, residents and businessowners in SBD 33 and SBD 27 face a much higher tax burden (and tougher sell) to raise sufficient funds for facility improvements in their school zone. The court observed the results firsthand through the dated and in some cases dilapidated state of many structures at LaGrange High School and its feeder schools, as well as the overcrowding at S.J. Welsh Middle School and Barbe High School. Certain rural and exurban districts are similarly disadvantaged, with per-pupil, per-mill funding capacities of $60.37 for SBD 21 (DeQuincy), $37.83 for SBD 25 (Iowa), and $50.33 for SBD 28 (Bell City). *Id.* The other districts in Ward 3, SBD 31 (North Lake Charles) and SBD 34 (Southwest Lake Charles), fare little better with respective per-pupil, per-mill funding capacities of $98.38 and $112.68. *Id.*

During the court's site visits, the undersigned also observed significant overcrowing and facility needs in the middle schools within SBD 33 (Southeast Lake Charles) and SBD 34 (Southwest Lake Charles). The magnet and charter school models have proven

ineffective at reducing overcrowding and evenly distributing enrollment around the district. The court believes that a laboratory middle school (sixth through eighth grade) at McNeese State University would help to alleviate facility concerns in Ward 3 by drawing on the resources of the university's top-rated School of Education, creating an alternative for students seeking out-of-zone permits and an opportunity to explore innovative teaching methods for current and future educators throughout the district. The school board is encouraged to coordinate and cooperate with the university in implementing this model.

As Dr. Burckel noted, the district's approach has created "a system where a child's access to safe, modern facilities is determined not by need, but by the [] tax base within arbitrary district boundaries set many years ago with little or no rational educational benefit." *Id.* at 14. The SBDs covering industrial zones of the parish are poised for an even greater windfall, too, with the expiration of the Industrial Tax Exemption Program for certain facilities as well as the arrival of LNG export terminals and supporting infrastructure. *See id.* at T. 14. Because of the district's bonding structure, only a small student population will capture this surge in revenue. But the entire parish shares the burdens of industry and should likewise share in its benefits. A parish-wide bonding would eliminate the problems created by the staggered bonds for the various SBDs. Nine of eleven districts currently carry outstanding General Obligation Bond debt, with millages ranging from 5.62 to 40.97 mills and maturities from 2026 to 2038. The resulting "patchwork" of millages and maturities hinder the district's ability to plan long-term for new facilities and upgrades or assign revenue based on facility needs, enrollment shifts, or natural disasters. *Id.* at 14–16.

Calcasieu Parish students benefit from a parish-wide model that allows them to access special education services, advanced curricula, language immersion, and career training regardless of where they reside. As a result, certain elementary schools draw close to half of their student population from outside their respective attendance zones. For 2025–26, Dolby Elementary drew 53.82% of its student population from out-of-zone with only 8.92% categorized as majority-minority ("MM") transfers. *Id.* at T. 2. A.A. Nelson had 47.53% out-of-zone student population with only 10.55% MM. Prien Lake Elementary School had 44.96% out-of-zone student population with only 9.05% MM. *Id.* The school zone divisions created by the bonding districts do not meet the needs of the students, who regularly cross attendance zones as if they did not exist. The school board's myopic commitment to bonding districts prevents the money from following the students and providing maximum educational benefits across the parish. The court reminds the parish and its residents that Calcasieu Parish School Board presides over one school system, not eleven independent school districts. Old rivalries such as East Calcasieu versus West Calcasieu, North Lake Charles versus South Lake Charles, and rural versus urban are outmoded. Further, this system aggravates the injustices and imbalances that drove the original desegregation orders. Accordingly, the school district has not satisfied its obligations with respect to facilities and the court will retain its oversight for the time being. The Calcasieu Parish School Board is ordered to submit to the court within 180 days of this ruling a plan that will move the district to parish-wide bonding for academic facilities.

## IV.
## CONCLUSION

For the reasons stated above, **IT IS ORDERED** that Calcasieu Parish School Board be released from all obligations contained within the court's prior rulings in these desegregation matters with respect to student assignment, faculty and staff composition, transportation, and extracurriculars. Accordingly, attendance zone oversight and majority-minority transfers as compelled under this court's rulings shall cease for the 2027–2028 school year.

**IT IS FURTHER ORDERED** that Calcasieu Parish School Board devise a plan to move to parish-wide bonding for academic facilities, and submit the proposed plan to the court within **180 days** of this order. The court will, however, permit the existing bonding districts to continue for special projects such as athletic facilities. Gymnasiums are considered academic facilities under this ruling because of physical education requirements as well as the use of school gyms for assemblies and other academic purposes.

Finally, **IT IS ORDERED** that the bond election scheduled for November 3, 2026, may proceed because it is already on the ballot but no additional bonding elections or tax elections may be proposed without court approval.

**THUS DONE AND SIGNED** in Chambers on the 27th day of August, 2026.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**